STATE of Utah, Plaintiff and Appellee,

v.

David Andrew MOOSMAN, Defendant and Appellant.

No. 870251.

Supreme Court of Utah.

June 1, 1990.

Robert W. Gutke, Logan, for defendant and appellant.

R. Paul Van Dam, Sandra L. Sjogren, Salt Lake City, for plaintiff and appellee.

HALL, Chief Justice:

This case is on appeal from the First Judicial District Court, Cache County. Defendant David Andrew Moosman was convicted of murder in the first degree, a capital felony, communications fraud, a first degree felony, and filing a false or fraudulent insurance claim, a second degree felony. Defendant presents three issues on appeal: (1) that because this was a felony case, the trial court erred in failing to conduct a jury trial where the record was silent concerning any waiver of defendant's right to a jury trial; (2) that the court erroneously allowed testimony concerning the cause of death from a forensic pathologist who did not actually conduct all parts of the autopsy on the deceased; and (3) that the evidence does not support a conviction on any of the counts against defendant. We affirm the trial court.

## FACTS

When challenging the findings of fact of the trial court on appeal, the appellant must show that the findings of fact were clearly erroneous.[1] In order to show clear error, the appellant must marshal all of the evidence in support of the trial court's find-

---

1. Utah R.Civ.P. 52(a).

ings of fact and then demonstrate that the evidence, including all reasonable inferences drawn therefrom, is insufficient to support the findings against an attack.[2] We recite the facts from the record most favorable to the findings of the trial court.[3]

On September 14, 1985, defendant and his wife, Tamara Moosman, were driving down Logan Canyon, returning from Bear Lake to Logan. At approximately 8:30 p.m., the pickup truck driven by defendant left the roadway, vaulted through the air, and traveled 285 feet down a slope, rolling one and three quarter times before coming to rest on the driver's side in the Logan River. Defendant apparently exited the truck sometime before or shortly after it left the roadway; however, Mrs. Moosman remained in the truck throughout its descent. Rescuers found Mrs. Moosman's lifeless body floating face down in the Logan River some distance downstream.

At this point, the facts diverge. Defendant claims that he helped his wife out of the truck and to the bank and that she appeared to be all right, that there was no blood or injuries. He then climbed up the slope and attempted to flag down passing traffic. He stated that it took him from the time the incident occurred, 8:30 p.m., until 11:15 p.m. to climb up to the road to flag down assistance.

The medical examiner testified that Mrs. Moosman died from drowning and that she had several lacerations on her scalp that were caused by a blunt instrument but were inconsistent with anything inside the truck. The medical examiner also testified that had the head wounds been caused by being jostled around in the cab of the truck, the nature of the wounds would have caused profuse bleeding that would have stained the interior of the cab. No stains were found. In addition, the medical examiner testified that Mrs. Moosman had seat belt striations across her chest and abdomen, indicating that she was wearing her seat belt.

The trial court found that defendant intentionally steered the truck off the road and jumped from the truck in an area offering the least risk sometime before the truck came to a stop in the middle of the river. The trial court also found that when defendant's attempt to kill his wife by staged accident failed, he climbed down the hill, struck her on the head with a blunt instrument,[4] and allowed her body to float down the river, thereby drowning her.

The trial court found that defendant had a number of motives. First, evidence was presented as to the marital discord between defendant and his wife. Defendant even spoke to a friend about possible ways to murder his wife and make it look like an accident. Second, defendant took out a one hundred thousand dollar life insurance policy on his wife nine months prior to the accident. Finally, defendant wanted to be rid of his wife and yet obtain custody of the children and all of the marital property without going through the process of divorce.

## I. WAIVER OF RIGHT TO JURY TRIAL

Defendant's first claim of error is that the trial court failed to afford defendant a jury trial as is required in a felony case pursuant to Utah Code Ann. § 77–35–17(c) (1982), which states: "All felony cases shall be tried by jury unless the defendant waives a jury in open court with the approval of the court and the consent of the prosecution."[5] Defendant claims that because there is no record of his having waived the right to a jury trial, the case should be remanded for a new trial with a jury.

It has long been held that the right to a jury trial is a fundamental constitutional

---

2. *Grayson Roper Ltd. v. Finlinson,* 782 P.2d 467, 470 (Utah 1989).

3. *State v. Johnson,* 784 P.2d 1135, 1137 (Utah 1989); *State v. Verde,* 770 P.2d 116, 117 (Utah 1989).

4. A piece of p.v.c. pipe was found at the scene.

5. Repealed effective July 1, 1990. See rule 17(c) of the Utah Rules of Criminal Procedure, which reads verbatim section 77–35–17(c).

right.[6] Even though the right to a jury trial is fundamental, it may be voluntarily waived by a defendant.[7]

In *State v. Cook*,[8] the defendant was charged with criminal mischief, a third degree felony. At arraignment, the case was originally set for a jury trial, but at a pretrial hearing at which the defendant was not present, the prosecutor asked for and was granted a nonjury trial. All of this was done after the defendant's attorney was permitted to withdraw as counsel. The defendant was convicted on a lesser included offense in a nonjury trial. Cook appealed his conviction on the ground that he was not allowed a jury trial in a felony case where he did not waive his right to a jury trial on the record. We held:

> There is nothing in the record before the Court to show that defendant's statutory right was properly waived by defendant. ... This unexplained vacation of the jury trial setting is unjustifiable in view of the statute's express language.... In any event, no waiver of a jury was ever made by defendant in open court or on the record. Such waiver will not be presumed from a silent record.
>
> A criminal defendant's right to a jury trial is substantial and valuable and should be carefully safeguarded by our courts.[9]

In *State v. Garteiz*,[10] the defendant was from Spain. He had been in this country only eighteen months, and his level of competency in English was marginal. Because the defendant had an interpreter, the court found that the defendant knowingly and intentionally waived a jury trial. Concurring specially in the *Garteiz* per curiam opinion, Justice Durham stated: "I urge trial courts to undertake a careful explana-tion of the nature of the right to a jury trial before accepting a defendant's waiver thereof, particularly where the defendant's circumstances may appear on their face to create obstacles to his clear understanding of the choice he is making." [11]

This court places great emphasis on the importance of a defendant's understanding the nature and extent of the waiver of a jury trial. The issue in this case is primarily whether a waiver was made and secondarily to what extent the waiver was informed and knowledgeable.

Pursuant to rule 11 of the Rules of the Utah Supreme Court, we previously remanded this case to the First Judicial District Court, Cache County, for the purpose of supplementing the record with respect to the circumstances surrounding the question of whether defendant waived his right to a jury trial. Rule 11(h) states:

> If any difference arises as to whether the record truly discloses what occurred in the district court, the difference shall be submitted to and settled by that court and the record made to conform to the truth. If anything material to either party is omitted from the record by error or accident or is misstated therein, the parties by stipulation, or the district court or the Supreme Court, either before or after the record is transmitted to the Supreme Court, on proper suggestion or of its own initiative, may direct that the omission or misstatement be corrected, and if necessary that a supplemental record be certified and transmitted.... All other questions as to the form and content of the record shall be presented to the Supreme Court.

---

6. U.S. Const. amend. VI; Utah Const. art. I, § 10; *see generally Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968); *Mel Hardman Productions, Inc. v. Robinson*, 604 P.2d 913 (Utah 1979); *State v. James*, 30 Utah 2d 32, 512 P.2d 1031 (1973); *Flynn v. W.P. Harlin Constr. Co.*, 29 Utah 2d 327, 509 P.2d 356 (1973).

7. *Kennedy v. Morris*, 639 P.2d 142, 143 (Utah 1981) (per curiam); *State v. Yeck*, 566 P.2d 1248, 1249 (Utah 1977); *State v. Christean*, 533 P.2d 872, 874 (Utah 1975); *State v. Maguire*, 529 P.2d 421, 422 (Utah 1974).

8. 714 P.2d 296 (Utah 1986) (per curiam).

9. *Id.* at 297–98 (citing Utah Const. art. I, § 12; *Duncan v. Louisiana*, 391 U.S. 145, 157–58, 88 S.Ct. 1444, 1451–52, 20 L.Ed.2d 491 (1968); *State v. Studham*, 655 P.2d 669, 671 (1982)).

10. 688 P.2d 487 (Utah 1984) (per curiam).

11. *Id.* at 489.

The advisory committee note to rule 11(h) states:

> This paragraph applies whenever there is a question as to whether the transcript or the original papers accurately reflect what occurred in the district court. These disputes should usually be submitted to the district court since it will ordinarily be in the best position to ascertain the correctness of the record. Under unusual circumstances, however, it may be appropriate for such a dispute to be submitted to the Supreme Court. . . .

The advisory committee notes to the federal counterpart [12] do not discuss the purpose and function of the rule; however, a number of federal cases are enlightening.

In *Hanson v. Parkside Surgery Center,*[13] the plaintiff claimed that the manner of selection and size of the jury was erroneous. On appeal, the defendant submitted a motion under rule 10(e) of the Federal Rules of Appellate Procedure to have the trial court supplement the record with regard to a meeting held in chambers, before trial and off the record, where the plaintiff waived any objections to the manner and selection of the jury.

The trial court supplemented the record with respect to what was said off the record in the judge's chambers. When the plaintiff appealed, objecting to the supplementation of the record, the court of appeals stated: "In reaching this decision we reject plaintiff's overly restrictive reading of Fed.R.App.P. 10 and find the district court's statement on the evidence or proceedings is properly before us pursuant to Fed.R.App.P. 10(e)."[14]

In *Whetton v. Turner,*[15] the petitioner was convicted of second degree murder. On a writ of habeas corpus, he claimed that he had been subjected to improper questioning. In order to substantiate these claims, he requested a transcript of the trial proceedings. It was discovered that the reporter's notes which had been filed in the county clerk's office could not be found. The petitioner claimed that based on the inability to provide a transcript, he should be released from prison.

The *Whetton* court stated:

> [W]e deem it safe and proper to assume that proceedings have been carried on in conformity with the law. Accordingly, when there is no transcript as to what happened, we indulge that presumption; and in the absence of persuasive proof, the trial court as the finder of the facts is not obliged to find to the contrary.
>
> We do not desire to be so arbitrary as to say that in no instance would the lack of a transcript be deemed of critical importance. . . . If it appears that there is any reasonable likelihood that there was some substantial failure to accord the accused the protections our law affords, or that there may have been a miscarriage of justice . . . then the best possible effort should be made to reconstruct the record and ascertain just what occurred. This determination is to be made by the trial court, subject to the usual rules of procedure, and review by this court.[16]

Pursuant to rule 11, we remanded the instant case. Our intent was for a hearing to be held with the prosecutor, defense counsel, and defendant present, the purpose being to review the facts concerning the apparent waiver.[17] Instead, the parties

---

12. Rule 11(h) of the Rules of the Utah Supreme Court is essentially identical to 10(e) of the Federal Rules of Appellate Procedure.

13. 872 F.2d 745 (6th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 349, 107 L.Ed.2d 337 (1989).

14. *Id.* at 748 n. 4. For additional case law on the ability and authority of trial courts to supplement the record on appeal, see *Gibson v. Blackburn,* 744 F.2d 403, 405 n. 3 (5th Cir.1984); *United States v. Garrett,* 727 F.2d 1003, 1012–13 (11th Cir.1984), *aff'd on other grounds,* 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985).

15. 28 Utah 2d 47, 497 P.2d 856 (1972).

16. *Id.* at 49–50, 497 P.2d at 858 (citations omitted).

17. New proceedings of a substantive nature are not within the scope of rule 11(h) of the rules of the Utah Supreme Court or the Federal Rules of Appellate Procedure. *See United States v. Johnson,* 713 F.2d 633, 648 (11th Cir.1983), *cert. denied sub. nom. Wilkins v. United States,* 465 U.S. 1081, 104 S.Ct. 1447, 79 L.Ed.2d 766 (1984). The Utah rule envisions only a clarification of what actually occurred in the lower court that

submitted proffers of evidence in the form of affidavits to the trial judge stating the recollection each had of the circumstances surrounding the waiver. The prosecutor recalled and the judge so found, apparently based upon his own recollection, that there was an *in camera* conference, with defendant and defense counsel present. The supplemental findings state that the judge fully explained defendant's right to a jury trial and the implications of a waiver and that defendant personally, voluntarily, and knowingly waived his right to a jury trial. Defense counsel submitted affidavits stating that a hearing did take place wherein the right to jury trial was waived but that defendant was not present. Defendant's affidavit stated that he was not present at any hearing involving the waiver of his right to a jury trial and that the judge did not explain defendant's rights and the implications of a waiver.

It is not in dispute that approximately one week prior to trial, defense counsel advised the clerk of the court not to call a jury, the intention being to try the case to the court. Also undisputed is the fact that on the morning of trial, a hearing was held in chambers at which time defense counsel did, in fact, waive the presence of a jury. No formal record was kept of this hearing by reason of an oversight in requiring the court reporter to be present. Nevertheless, we are assured by the trial judge in his supplemented findings of the court that defendant was present and that he personally waived his right to proceed to trial with a jury. Not until the appeals process, where defendant is represented by new counsel, does the issue of a nonjury trial arise.

The procedure designated in rule 11 for supplementation of the record was properly followed in this case, and the supplementa-tion of the record is properly before us. Based upon the affidavits and findings in the supplemented record before us, we conclude that both defendant and his counsel attended a hearing wherein defendant personally made a knowing and voluntary waiver of a jury trial.

## II. RIGHT TO CONFRONT WITNESSES

Defendant claims that the trial court violated his constitutional right to confront witnesses against him by allowing the hearsay testimony of Dr. Sweeney, the pathologist who supervised the autopsy, rather than requiring Dr. Salazar, the forensic pathology fellow and medical examiner assistant who actually performed the autopsy, to testify. Defendant also claims that the burden to produce Dr. Salazar was on the State rather than on defendant. However, this issue is rendered moot by our resolution of the confrontation issue.

The right of an accused to confront witnesses against him is a fundamental right guarded by both the federal and state constitutions.[18] The United States Supreme Court has held, "[T]he right of an accused to be confronted with the witnesses against him must be determined by the same standards whether the right is denied in a federal or state proceeding...." [19] Although defendant mentioned the state constitutional and statutory provisions in his brief, his argument is based upon sixth amendment cases; therefore, we will consider this issue a sixth amendment right-to-confrontation challenge.[20] The sixth amendment right to confrontation, however, is not an absolute right.[21]

Simply because testimony of extrajudicial statements might be admissible under a hearsay exception does not mean that

was excluded or omitted from the record. The instant case falls within the latter category.

**18.** U.S. Const. amend. VI; Utah Const. art. I, § 12; Utah Code Ann. § 77–1–6(1)(d) (1982); *see generally Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968).

**19.** *Pointer v. Texas*, 380 U.S. 400, 407–08, 85 S.Ct. 1065, 1069–70, 13 L.Ed.2d 923 (1965).

**20.** *See State v. Williams*, 773 P.2d 1368, 1372 n. 12 (Utah 1989).

**21.** *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986); *Williams*, 773 P.2d at 1372; *Murray City v. Hall*, 663 P.2d 1314, 1321 (Utah 1983).

those statements automatically pass constitutional muster. If the evidence violates a defendant's right to confront witnesses, it should not be admitted.[22]

■ In order to evaluate the extent of a violation of the right of confrontation, we adopt a two-part test. First, we look at whether the State's presentation of hearsay testimony of extrajudicial statements or occurrences is "crucial" to the State's case or "devastating" to the defendant. Second, we look at the availability of the declarant and whether the presence of the declarant will add any probative value to the evidence by allowing the trier of fact to observe the demeanor of the witness.[23] On appeal, the burden is on the appellant to show that each part of the test indicates that his right to confrontation was violated by admission of the hearsay evidence.

■ In the present case, the testimony of Dr. Sweeney was important to the prosecution but was not necessarily crucial. The purpose of the autopsy report was to establish the cause of death. Dr. Sweeney testified that the cause of death was drowning and that the wounds on the victim's head were consistent with being inflicted by a blunt instrument and differed from wounds made by being thrown around in the cab of a truck as it rolled over.

Although Dr. Sweeney's testimony may have been important, it was not the most crucial aspect of the case. If death occurred as the result of blows to the head with a blunt instrument, causing unconsciousness and drowning, then the trier of fact could find defendant guilty of murder. If death occurred as a result of blows to the head from the body's being thrown around in the cab of the truck as it turned over going down the hill, then the trier of fact could still find defendant guilty of

murder. The most crucial aspect of the prosecution's case was proving that defendant had the requisite intent to murder when the truck veered off the road. The ultimate cause of death is only one of the elements of the case from which the trier of fact could find intent.

The second part of the test requires that defendant show that the testimony of Dr. Salazar would be more reliable than the testimony of Dr. Sweeney. While Dr. Sweeney testified that his testimony was based in part upon his reliance on Dr. Salazar's autopsy notes, Dr. Sweeney also testified that he observed the wounds on the victim's head, as well as other aspects of the outer body prior to the autopsy, and that he was present at intermittent intervals throughout the autopsy and supervised the procedure. In addition, Dr. Sweeney testified that he discussed the autopsy with Dr. Salazar at its conclusion.

It is inconceivable that Dr. Salazar's testimony would be more reliable than Dr. Sweeney's. The trial occurred approximately eighteen months after the autopsy, and Dr. Salazar would likely have had to rely on his own autopsy notes, as did Dr. Sweeny. Because Dr. Sweeney supervised the autopsy and discussed the results with Dr. Salazar, there is no reason to believe that Dr. Salazar's testimony would differ from Dr. Sweeney's.

In *Reardon v. Manson*,[24] the defendant was convicted of a drug charge. The state established the illegal nature of the substances seized from the defendant by testimony of one of three state toxicologists. Dr. Reading, one of the toxicologists, supervised the test procedures that were performed by two dozen chemists in the laboratory. The district court held that the testimony of Dr. Reading was hearsay and was inadmissible because it violated the

**22.** *Dutton v. Evans,* 400 U.S. 74, 82, 91 S.Ct. 210, 216, 27 L.Ed.2d 213 (1970); *California v. Green,* 399 U.S. 149, 155–56, 90 S.Ct. 1930, 1933–34, 26 L.Ed.2d 489 (1970); *United States v. Bernard S.,* 795 F.2d 749, 753 (9th Cir.1986); *United States v. Huber,* 772 F.2d 585, 588 (9th Cir.1985); *United States v. Oates,* 560 F.2d 45, 80–81 (2d Cir. 1977); *United States v. Puco,* 476 F.2d 1099, 1102 (2d Cir.), *cert. denied,* 414 U.S. 844, 94 S.Ct. 106, 38 L.Ed.2d 82 (1973).

**23.** *See generally Rado v. State of Connecticut,* 607 F.2d 572 (2d Cir.1979), *cert. denied,* 447 U.S. 920, 100 S.Ct. 3009, 65 L.Ed.2d 1112 (1980).

**24.** 806 F.2d 39 (2d Cir.1986), *cert. denied,* 481 U.S. 1020, 107 S.Ct. 1903, 95 L.Ed.2d 509 (1989).

defendant's right to confront the witnesses against him, the chemists who actually performed the tests.[25] The defendant relied upon the holding of the district court in his brief but failed to discover that the case was reversed on appeal.

The Second Circuit Court of Appeals in *Reardon* held:

> The confrontation clause is not necessarily violated by the prosecution's failure to produce a hearsay declarant for cross-examination at trial where the "utility of trial confrontation" would be "remote" and of little value to either the jury or the defendant.
>
> ... [I]t is most unlikely that the chemists who assisted Dr. Reading would have any independent recollection of the tests they performed. Their testimony inevitably would have been based on their laboratory notes, which Dr. Reading was well qualified to interpret....
>
> We conclude that there would have been little potential utility in requiring the state to produce the assisting chemists for cross-examination as to whether they were telling the truth when they informed Dr. Reading that they had tested the substances he gave them and that the results they brought for his inspection were obtained in accordance with his instructions and standard laboratory procedures.[26]

In the present case, Dr. Salazar's testimony would add nothing to the reliability of the testimony of Dr. Sweeney or the evidence as a whole. Dr. Sweeney had more contact with the actual autopsy and more direct supervision over the procedure than did Dr. Reading in *Reardon*. In addition, Dr. Sweeney's testimony was not based solely upon the written and oral reports of Dr. Salazar but was also based upon personal observations.

We agree with the court of appeals in *Reardon*, which held:

Expert reliance upon the output of others does not necessarily violate the confrontation clause where the expert is available for questioning concerning the nature and reasonableness of his reliance. This is particularly true where the defendants have access to the same sources of information through subpoena or otherwise.

... [A]t least in those borderline cases where the likely utility of producing the witness is remote, the Sixth Amendment's guarantee of an opportunity for effective cross-examination is satisfied where the defendant himself had the opportunity to call the declarant as a witness.[27]

The trier of fact may consider the degree to which the witness was actually involved in the procedure and apply that toward the weight and reliability of the evidence.[28] In order to assist the trier of fact, it is incumbent upon the defense to cross-examine the expert as to his contacts with the test procedures and the reliability of the procedures.

When the prosecution seeks to introduce hearsay testimony through one of the hearsay exceptions without producing the declarant, the confrontation clause requires the prosecution to show that adequate indicia of reliability and trustworthiness exist.[29] In the present case, such indicia of reliability and trustworthiness exist. Dr. Sweeney maintained regular supervision over the autopsy procedures, which are generally standardized. Dr. Sweeney discussed the results and conclusions concurrently with Dr. Salazar, and in addition, Dr. Sweeney's testimony was based, in part, on personal observation.

## III. INSUFFICIENCY OF THE EVIDENCE

■ We have reviewed defendant's remaining claim, that the State did not

---

**25.** *Reardon v. Manson,* 491 F.Supp. 982 (D.Conn.1980).

**26.** 806 F.2d at 41–42 (citations omitted).

**27.** 806 F.2d at 42 (citations omitted).

**28.** *See Diaz v. State,* 728 P.2d 503, 514 (Okla. Crim.1986); *State v. Clayton,* 646 P.2d 723, 727 (Utah 1982).

**29.** 806 F.2d at 43.

**482**

present sufficient evidence to sustain the convictions. However, in light of the detailed findings of fact of the trial judge, all of which find support in the record, we find this claim to be without merit.

Affirmed.

HOWE, Associate C.J., and DURHAM and ZIMMERMAN, JJ., concur.

STEWART, J., concurs in the result.